Alexis Holyweek SAREI, Paul E. Nerau, Thomas Tamuasi, Phillip Miriori, Gregory Kopa, Methodius Nesiko, Aloysius Moses, Raphael Niniku, Gabriel Tareasi, Linus Takinu, Leo Wuis, Michael Akope, Benedict Pisi, Thomas Kobuko, John Tamuasi, Norman Mouvo, John Osani, Ben Korus, Namira Kawona, Joanne Bosco, John Pigolo, and Magdelene Pigolo, individually and on behalf of themselves and all others similarly situated, Plaintiff,

v.

RIO TINTO PLC and Rio Tinto Limited, Defendants.

Case No. CV 00–11695 MMM (MANx).

United States District Court, C.D. California.

July 31, 2009.

1006

Brent R. Walton, Elaine T. Byszewski, Kevin P. Roddy, Hagens Berman Sobol Shapiro LLP, Los Angeles, CA, Jeffrey T. Sprung, Shayne C. Stevenson, Steve W. Berman, Hagens Berman Sobol Shapiro, Joel D. Cunningham, Paul Luvera, Luvera Barnett Brindley Beninger & Cunningham, Seattle, WA, for Plaintiff.

Anthony L. Press, Charles Ernest Patterson, Morrison & Foerster, Los Angeles, CA, Jack W. Londen, James J. Brosnahan, Morrison & Foerster, San Francisco, CA, Shayne C. Stevenson, Hagens Berman Sobol Shapiro, Seattle, WA, Peter J. Stern, Morrison and Foerster LLP, Tokyo, Japan, Amanda Quester, Vincent M. Garvey, Federal Trade Commission, Washington, DC, for Defendants.

## ORDER RE: PRUDENTIAL EXHAUSTION

MARGARET M. MORROW, District Judge.

Plaintiffs, who are current and former residents of the island of Bougainville in Papua New Guinea ("PNG"), filed this putative class action in 2000 against defendants Rio Tinto plc and Rio Tinto Limited under the Alien Tort Claims Act ("ATCA" or "ATS"), 28 U.S.C. § 1350. Plaintiffs allege that defendants' mining operations on Bougainville destroyed the island's environment, harmed the health of its people, and incited a ten-year civil war, during which thousands of civilians died or were injured. They assert that defendants are guilty of war crimes and crimes against humanity, as well as racial discrimination and environmental harm that violates international law.

In December 2008, an en banc panel of the Ninth Circuit Court of Appeals remanded the action to this court for the limited purpose of ascertaining whether, as an initial, prudential matter, exhaustion

should be required. See *Sarei v. Rio Tinto, PLC*, 550 F.3d 822 (9th Cir.2008) (en banc) (*"Rio Tinto IV"*); *id.* at 825 n. 1 (McKeown, J.) ("As a prudential matter, in this case there is a certain logic to considering exhaustion before considering threshold grounds that may 'deny[ ] audience to a case on the merits'" (citation omitted; alteration original)).

## I. PROCEDURAL BACKGROUND

The factual background of this dispute is detailed extensively in the court's prior order on defendants' motion to dismiss; that discussion is incorporated by reference in this order. See *Sarei v. Rio Tinto*, 221 F.Supp.2d 1116, 1121–27 (*"Rio Tinto I"*); see also *Rio Tinto IV*, 550 F.3d at 825–26 (McKeown, J.) (factual and procedural overview). The court provides a brief summary of the procedural history of the action as relevant to the issue on remand below.

### A. Plaintiffs' Lawsuit and *Rio Tinto I*

On November 2, 2000, Alexis Holyweek Sarei, a California resident who lived in Bougainville between 1973 and 1987, and twenty-one individuals who then resided in Bougainville or elsewhere in PNG, filed this putative class action against Rio Tinto plc and Rio Tinto Limited (collectively "Rio Tinto"). Shortly thereafter, plaintiffs filed a first amended complaint asserting claims under the Alien Tort Claims Act, 28 U.S.C. § 1350.[1] The amended complaint pled claims for crimes against humanity; war crimes/murder; violation of the rights to life, health, and security of the person; racial discrimination; cruel, inhuman, and degrading treatment; violation of international environmental rights; and a consistent pattern of gross violations of human rights.[2] The pleading also alleged claims for negligence, public nuisance, private nuisance, strict liability, equitable relief, and medical monitoring.[3] Plaintiffs contend that Rio Tinto's mining operations destroyed Bougainville's environment and the health of its residents. They also assert that, because the mine was a joint venture between Rio Tinto and the PNG government, and because Rio Tinto's threats led PNG to use military force against the Bougainvilleans, it is responsible for human rights violations and war crimes committed during Bougainville's civil war.

On January 26, 2001, Rio Tinto filed a motion to dismiss plaintiffs' complaint,[4] asserting that the court lacked subject matter jurisdiction because plaintiffs had failed to state a cognizable claim under the Alien Torts Claim Act. Alternatively, it argued that the action should be dismissed on *forum non conveniens* grounds, as either Papua New Guinea or Australia was a more appropriate forum. Finally, Rio Tinto challenged plaintiffs' claims as nonjusticiable under the act of state, political question, and international comity doctrines.

In July 2002, the court issued a final order on Rio Tinto's motion to dismiss,[5] which, *inter alia*, addressed its threshold argument that the action should be dismissed because plaintiffs had not exhausted remedies available locally in PNG. *Rio*

---

1. First Amended Class Action Complaint for Violations of the Alien Tort Claims Act [28 U.S.C. § 1350], Docket No. 7 (Dec. 6, 2000).

2. See *id.*, ¶¶ 210–66.

3. See *id.*, ¶¶ 267–93.

4. Notice of Motion and Motion to Dismiss for Failure to State a Claim, Docket No. 18 (Jan. 26, 2001).

5. See Amended Order Granting Defendants' Motion to Dismiss, 221 F.Supp.2d 1116 (C.D.Cal.2002). The court had previously issued an order on the motion in March 2002. (See Order, Docket No. 131 (Mar. 23, 2002).)

*Tinto I,* 221 F.Supp.2d at 1132–33. Comparing the ATCA and the Torture Victims Protection Act ("TVPA"), the court concluded that there was no explicit statutory requirement that plaintiffs exhaust local remedies before filing suit in federal court under the ATCA, and no indication in the legislative history that Congress intended to impose such a requirement on ATCA claims. *Id.* at 1132–38. The court next considered Rio Tinto's alternative argument, namely, that exhaustion of local remedies is a well-established principle of international law and should be required of an ATCA plaintiff pleading a "violation of the law of nations." *Id.* at 1138–39. The court concluded that "the ATCA does not adopt wholesale all principles of international law," but instead "creates a domestic cause of action for violations of international law," which "need not impose the same conditions on a plaintiff's right to sue as international law or the domestic law of other nations." *Id.* at 1139. Consequently, the court held that plaintiffs were not required to exhaust remedies available in PNG, or show that doing so would be futile, before filing an ATCA suit in federal court. *Id.*

### B. *Sosa, Rio Tinto II* and *Rio Tinto III*

The parties filed cross-appeals. Plaintiffs challenged the court's dismissal of their ATCA claims on jurisdictional and political question grounds, while Rio Tinto maintained that the ATCA required exhaustion of local remedies. The appeal was argued and submitted on September 8, 2003; the panel withdrew the submission, however, on December 11, 2003, to await the Supreme Court's opinion in *Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

In *Sosa,* the Supreme Court held that the ATCA "is a jurisdictional statute creating no new causes of action." It noted, however, that the statute "was intended to have practical effect the moment it became law," and thus provided a "cause of action for [a] modest number of international law violations with a potential for personal liability." *Id.* at 724, 124 S.Ct. 2739. Consistent with this view of the statute, the Court held that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" it identified when tracing the ATCA's history. *Id.* at 725, 124 S.Ct. 2739. The Court observed in dicta that it "would certainly consider" an exhaustion requirement "in an appropriate [ATCA] case." *Id.* at 733 n. 21, 124 S.Ct. 2739.

Following *Sosa,* in June 2005, the parties reargued their cross-appeals in this case and the matter was resubmitted. In August 2006, a three-judge panel of the Ninth Circuit affirmed in part, reversed in part, and remanded. See *Sarei v. Rio Tinto, PLC,* 456 F.3d 1069 (9th Cir.2006) ("*Rio Tinto II* "), withdrawn and superseded on rehearing in part by *Sarei v. Rio Tinto, PLC,* 487 F.3d 1193 (9th Cir.2007) ("*Rio Tinto III* ") (Fisher, J.). Rio Tinto petitioned for rehearing and rehearing en banc. Its petition was initially granted in part; the merits panel's majority and dissenting opinions were withdrawn and superseded by *Rio Tinto III.*

In *Rio Tinto III,* the panel considered Rio Tinto's contention that an exhaustion requirement should be read into the ATCA. *Id.* at 1213–23. Examining congressional intent—of "paramount importance" in any exhaustion inquiry—the court concluded that the ATCA's "legislative history stopped] short of a broad and unambiguous statement that Congress believed that the satisfaction of the international exhaustion rule was *required* as a matter of U.S. domestic law before an ATCA claim could be heard in a U.S.

court." *Id.* at 1214, 1217. Noting that the TVPA targeted only torture and extrajudicial killing claims, the panel observed that in "addressing causes of action based on norms of customary international law, Congress … treated different kinds of substantive claims differently—a caution against importing an across-the-board exhaustion requirement into ATCA based on what Congress did in the TVPA." *Id.* at 1217–18.

Finding no support for a statutory exhaustion requirement in the text or legislative history of the ATCA, the court next assessed whether exhaustion was warranted as a matter of judicial discretion. Ultimately, it concluded that "the balance tips against judicially engrafting an exhaustion requirement onto a statute where Congress has declined to do so, and in an area of international law where the Supreme Court has called for the exercise of judicial caution rather than innovation." *Id.* at 1219.[6]

Judge Bybee wrote a lengthy dissent expressing the view that exhaustion of local remedies should be required before a U.S. court exercises jurisdiction over ATCA claims. *Id.* at 1224–46 (Bybee, J., dissenting). Judge Bybee observed that exhaustion "is a well-established principle of international law," and one the United States "has long recognized." *Id.* at 1231. In addition, he referenced various international tribunals and treaties requiring exhaustion. *Id.* at 1232–33. After discussing whether exhaustion was procedural or substantive, *id.* at 1233–36, and concluding that the exhaustion requirement was sufficiently well-defined to be easily applied by the courts, *id.* at 1236–38, Judge Bybee argued that, at the very least, courts "should recognize exhaustion as a prudential principle required by our domestic law [ ] for the same reasons that we require exhaustion of state, tribal and administrative remedies." *Id.* at 1238.[7]

6. The court offered four reasons why it declined to require exhaustion as a matter of judicial discretion in every ATCA case. First, it noted that "the international norm of exhaustion does not speak to the hybrid situation [in an ATCA case] where a domestic court in a sovereign country, rather than an international tribunal, is charged with adjudicating violations of customary international law through the vehicle of a civil suit." *Id.* at 1220. Second, it concluded that international exhaustion was procedural rather than substantive, and noted that the Supreme Court had not addressed whether the methodology it employed in *Sosa* to identify substantive international norms within ATCA's jurisdictional grant also applied to procedural and other nonsubstantive customary law norms. *Id.* at 1221. Third, the court found defendants' argument that an exhaustion requirement could improve compliance with international human rights law by providing an incentive for nations to improve their legal systems "fairly speculative," and posited the "alternative and perhaps equally plausible hypothesis" that foreign court judgments against rights-abusing defendants could place pressure "from above" on the state where the

human rights abuses had occurred. *Id.* at 1222 (quoting Ellen Lutz & Kathryn Sikkink, *The Justice Cascade: The Evolution and Impact of Human Rights Trials in Latin America*, 2 Chi. J. Int'l L. 1, 4 (2001); *id.* at 24–25, 30). Finally, in a nod to the unique nature of the ATCA, the Ninth Circuit concluded that importing a blanket exhaustion requirement into the ATCA "by judicial fiat" was inadvisable, "especially when Congress has not seen fit to do so when it had the opportunity." *Rio Tinto III*, 487 F.3d at 1223.

7. Judge Bybee identified three reasons for imposing a prudential exhaustion requirement: (1) the requirement would demonstrate respect for the tribunals or other dispute resolution processes of a sovereign nation, *id.* at 1238–40; (2) it would give other countries "the opportunity to address their own conflicts and craft their own solutions," and would "encourage creative political solutions" that cannot readily be achieved through litigation, *id.* at 1240–41; and (3) it would foster more accurate fact-finding by requiring that the initial round(s) of litigation occur, when possible, where the claims arose, *id.* at 1242. In addition, he noted, an exhaus-

## C. *Rio Tinto IV*

Following the decision in *Rio Tinto III*, Rio Tinto filed a second petition for hearing en banc, which asserted that exhaustion ought to be required. The petition was granted. See *Sarei v. Rio Tinto, PLC*, 499 F.3d 923 (9th Cir.2007). The case was argued and submitted on October 11, 2007. On December 16, 2008, the en banc court remanded the case "for the limited purpose to determine in the first instance whether to impose an exhaustion requirement on plaintiffs." *Rio Tinto IV*, 550 F.3d at 832 (McKeown, J.).

Judge McKeown, who authored the plurality opinion, concluded that the *Sosa* Court's statement that exhaustion should be considered in an "appropriate" ATCA case indicated that exhaustion ought to be approached "as a prudential principle." *Id.* at 827. Juxtaposing "prudential" or judicially-imposed exhaustion with statutory exhaustion requirements, she explained that the former "originated [in the United States] in habeas corpus cases to serve a gatekeeping function," i.e., to prevent unnecessary conflicts between the federal and state courts, which are "equally bound to guard and protect [constitutional] rights." *Id.* at 828 (citation omitted). In this context, and in the tribal court context as well, Judge McKeown stated, the principle of prudential exhaustion is "grounded in principles of comity," specifically respect for another, potentially conflicting sovereign. *Id.* at 828–29. Judge McKeown compared the prudential exhaustion requirement in these areas with the exhaustion of local remedies rule that is part of international law, and concluded that the international rule too was motivated by concerns regarding comity. *Id.* at 829–30.

Judge McKeown next discussed the considerations animating exhaustion. She noted that cases like this one "simultaneously appeal to two divergent impulses that have traditionally played out in our country's international affairs and have been imported into our legal system. The first impulse is to safeguard and respect the principle of comity.... The second is the American role in establishing collective security arrangements that support international institutions, including international tribunals.... Both impulses draw from the recognition that we need a complement to our domestic system, because we are but one member in a community of nations." *Id.* at 830–31.

The interplay of these concerns informs the prudential exhaustion analysis that the plurality directed be conducted here:

> "The lack of a significant U.S. 'nexus' [in this case] is an important consideration in evaluating whether plaintiffs should be required to exhaust their local remedies in accordance with the principle of international comity.... [On the other hand, s]ome of the [plaintiffs'] claims—torture, crimes against humanity, and war crimes—may implicate matters of 'universal concern,' generally described as offenses 'for which a state has jurisdiction to punish without regard to territoriality or the nationality of the offenders.'" *Id.* at 831 (citations omitted).

Observing that the mere existence of universal jurisdiction did not necessarily mean that it should be exercised, Judge McKeown concluded that "in ATS cases where the United States 'nexus' is weak, courts should carefully consider the question of exhaustion, particularly—but not exclusively—with respect to claims that do not involve matters of 'universal concern.'" *Id.*

Several members of the en banc panel wrote separately to express their views

tion requirement would "preserve" the courts' role in a government of separated powers. *Id.* at 1242. Examining this action, Judge Bybee concluded that it was "a textbook case for exhaustion." *Id.* at 1245–46.

regarding exhaustion in the ATCA context.[8] Judge Bea, joined by Judge Callahan, concurred in the limited remand, but opined that the ATCA mandated application of a traditional exhaustion analysis in every case. *Id.* at 833–37 (Bea, J., concurring). Emphasizing the *Sosa* Court's explanation that the ATCA "simply provides a forum for hearing existing causes of action that arise under the law of nations," Judge Bea argued that "it makes more sense to interpret the [ATCA] as incorporating the whole of the law of nations: the rights it grants *and* the limitations it places on those rights." *Id.* at 833; *id.* at 835 ("But if exhaustion *is* raised [in a particular case], and so the case *is* appropriate, it would seem *Sosa* indicated the Court would consider exhaustion as a *requirement.* 'Deference to the political branches,' on the other hand, is not required, but only '*possible*,' and then only on a case-specific—i.e., prudential—basis"). Such an exhaustion requirement, he stated, would include standard exceptions for futility or ineffectiveness. *Id.* at 836 ("In other words, as *part* of the law of nations's exhaustion requirement, the futility excuse is *also* incorporated into the ATS's statutory exhaustion requirement. Thus, a statutorily required two-step exhaustion analysis would permit Sarei to prosecute his ATS claims without exhausting his local remedies in Papua New Guinea if he can prove that local remedies there are ineffective, unobtainable, unduly prolonged, inadequate, or otherwise futile to pursue").[9] Echoing Judge Bybee's dissent in *Rio Tinto III*, Judge Bea contended that "[a] mandatory requirement of exhaustion of local remedies, except where futile or otherwise unavailable, allows our courts to play the role the ATS intended them to play: an ultimate venue for claimed violations of the law of nations when those claimed violations cannot or will not be cured by the courts of the country in which the injuries occurred." *Id.*[10]

8. Judge Ikuta, joined by Judge Kleinfeld, dissented to express her view that "in the absence of direction from Congress, [courts] cannot read the ATS as authorizing an extension of jurisdiction to disputes lacking any nexus to United States territory, citizens, or interests." 550 F.3d at 840 (Ikuta, J., dissenting) (citing *Sosa*, 542 U.S. at 726, 124 S.Ct. 2739). Judge Reinhardt, joined by Judges Pregerson, Berzon, and Rawlinson, dissented. *Id.* at 841–46 (Reinhardt, J., dissenting). He argued that the *Sosa* Court had not "counseled" the court to adopt prudential exhaustion in the ATCA context, or "signaled" that it believed such a requirement was appropriate. *Id.* at 841. Consequently, Judge Reinhardt maintained, the court should refrain from imposing such a requirement before the Supreme Court had "had the opportunity to decide itself after the issue is properly presented to it." *Id.* at 841. Citing evidence that many putative class members feared returning to PNG, Judge Reinhardt also concluded that this case was not an "appropriate" one in which to require exhaustion. *Id.*

9. See *id.* at 836 (Bea, J., concurring) ("I wish to make clear that a statutory exhaustion requirement does not mean a plaintiff must prove in every case that he *has* exhausted his local remedies. Rather, it means a district court must conduct a two-step exhaustion analysis, in the process considering whether first, local remedies exist, and second, whether local exhaustion would be futile, unduly prolonged, or subject to one of the other exceptions recognized in customary international law. If so, local exhaustion requirements may be excused").

10. Judge Bea noted that the "one aspect" of Judge Bybee's *Rio Tinto III* dissent with which he disagreed was the latter's "speculat[ion] as to whether there was an additional, prudential basis for exhaustion" in the ATCA context. *Id.* at 834 n. 3. Judge Bea opined that "the elements that go into a prudential consideration, such as 'nexus' or international comity, [ ] should [not] be left to individual and potentially discordant trial court determinations." This was particularly true, he noted, because "[t]he facts underpin-

In the end, seven of the eleven members of the en banc panel declined to impose an exhaustion *requirement* in every ATCA case.[11] Six, however, agreed to remand the case to this court for the limited purpose of having the court consider whether to impose a *prudential* exhaustion requirement. *Id.* at 832 n. 10 (McKeown, J.).[12]

## II. DISCUSSION

### A. Prudential Exhaustion in Alien Tort Claims Act Cases

Where, as in the case of the ATCA, Congress has not clearly required exhaustion, sound judicial discretion governs. See *McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), superseded by statute as stated in *Booth v. Churner,* 532 U.S. 731, 732, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). "Judicially-imposed or prudential exhaustion is not a prerequisite to the exercise of jurisdiction, but rather is 'one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decisionmaking.'" *Rio Tinto IV,* 550 F.3d at 828 (McKeown, J.) (quoting *McCarthy,* 503 U.S. at 144, 112 S.Ct. 1081).

As noted, in *Sosa,* the Supreme Court recognized that imposing a prudential exhaustion requirement might be warranted in "appropriate" ATCA cases. *Sosa,* 542 U.S. at 733 n. 21, 124 S.Ct. 2739. Citing this observation, the *Rio Tinto IV* plurality held that "[w]here the 'nexus' to the United States is weak, courts should carefully consider the question of exhaustion, particularly—but not exclusively—with respect to claims that do not involve matters of 'universal concern.'" *Rio Tinto IV,* 550 F.3d at 824 (McKeown, J.). In conducting this analysis, the plurality directed that courts balance two competing interests. *Id.* at 830. On the one hand, they must "safeguard and respect the principle of comity." *Id.;* see also *Sosa,* 542 U.S. at 761, 124 S.Ct. 2739 (Breyer, J., concurring) ("I would ask whether the exercise of jurisdiction under the ATS is consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement"). On the other hand, "[t]he nature of certain allegations and the gravity of the potential violations of international law [ ] trigger the second impulse: [U.S. courts'] historical commitment to upholding customary international law." *Rio Tinto IV,* 550 F.3d at 831 (McKeown, J.). In analyzing prudential exhaustion in the ATCA context, therefore, courts must ask questions typically associated with the doctrine of international comity, while at the same time evaluating the universality of plaintiffs' claims.

Following the en banc court's remand, the court received briefs from the parties and held a hearing at which they present-

---

ning these prudential considerations are generally undisputed; the determinations primarily involve judicial policy with regard to international relations." *Id.* Consequently, Judge Bea opposed imposition of an initial, prudential exhaustion inquiry and argued for conducting a mandatory two-step exhaustion analysis in every ATCA case. *Id.*

**11.** See *Rio Tinto IV,* 550 F.3d at 824 (plurality authored by Judge McKeown joined by Judges Schroeder and Silverman); *id.* at 841 (dissent authored by Judges Reinhardt joined by Judges Pregerson, Berzon, and Rawlinson).

**12.** The judges who concurred in the limited remand were Judges McKeown, Schroeder, Silverman; Judges Bea and Callahan, *id.* at 833 (Bea, J., concurring) ("I concur in the plurality's conclusion that the district court erred by failing to conduct an exhaustion analysis, and I agree a limited remand is the preferable solution"); and Judge Kleinfeld, *id.* at 840 (Kleinfeld, J., concurring) ("I concur in the result reached by Judge McKeown's opinion, limited remand for consideration of whether exhaustion should be required. I do so because we must provide some clear direction to the district court, and only a result adopted by a majority can do so").

ed their respective positions concerning the nature of the inquiry the court had been asked to conduct. The parties disagreed regarding the meaning of the plurality's direction that the court "determine in the first instance whether to impose an exhaustion requirement on plaintiffs." *Id.* at 832. Plaintiffs argued that the court had been directed solely to decide, as a threshold matter, whether a prudential exhaustion requirement should be imposed in this case; they asserted that if the court answered that question yes, it should not conduct the traditional two-step exhaustion analysis but should return the matter forthwith to the circuit court.[13] Focusing on the plurality's discussion of the standard two-step exhaustion analysis as a "framework for evaluating exhaustion," Rio Tinto countered that it should be permitted to "justify an exhaustion requirement," which plaintiffs could rebut by demonstrating the futility of exhaustion. Specifically, it asserted that the court "should weigh the 'animating considerations' of U.S. nexus and matters of 'universal concern' and determine 'whether to impose an exhaustion requirement on plaintiffs'" only *after* considering "the

availability and adequacy of remedies" in Papua New Guinea.[14]

While, based on the language of the plurality opinion, the matter is not free from doubt, the court ultimately concluded that the plurality wished it to determine, as an initial threshold inquiry, whether it was appropriate to impose a prudential exhaustion requirement in this case.[15] It therefore solicited briefs that addressed the factors identified in the plurality opinion as relevant to this determination—i.e., nexus and universality, as informed by general notions of comity—and that refrained from arguing factors relevant in applying the traditional two-step exhaustion analysis—i.e., the availability of local remedies, and whether plaintiffs should be excused from exhausting local remedies because they "are ineffective, unobtainable, unduly prolonged, inadequate, or otherwise futile to pursue," *Rio Tinto IV,* 550 F.3d at 833 n. 1 (Bea, J., concurring).[16] The court further determined that, if it concluded a prudential exhaustion requirement should be imposed with respect to any of plaintiffs' claims, it would conduct the traditional two-step exhaustion analy-

13. Plaintiffs' Status Report and Request for Briefing Schedule, Docket No. 201 (Jan. 14, 2009).

14. Rio Tinto's Response to Plaintiffs' Status Report and Request for Briefing Schedule, Docket No. 204 (Mar. 6, 2009) at 3–7.

15. *Rio Tinto IV,* 550 F.3d at 833 n. 1 (Bea, J., concurring) ("[T]he district court must, in its discretion, choose whether [exhaustion is in fact required], depending on considerations such as whether [plaintiffs'] claims have a close nexus to the United States, affect principles favoring international comity and advancement of international institutions, and implicate notions of customary international law"); see *id.* at 832 (McKeown, J.) ("We remand to the district court for the limited purpose to determine in the first instance *whether* to impose an exhaustion requirement on plaintiffs" (emphasis added)); see also *id.* at 836 (Bea, J., concurring) ("[A] statutory

exhaustion requirement ... means a district court must conduct a two-step exhaustion analysis.... But this is different from the plurality's prudential exhaustion doctrine, which grants district courts discretion to decide whether or not to consider exhaustion in the first place"); *id.* at 837 n. 7 ("[I]t appears the plurality holds the district court here has discretion not to conduct a two-step exhaustion analysis should it find one unnecessary due to prudential considerations").

16. In its brief, Rio Tinto prematurely raised arguments regarding access to witnesses and evidence in PNG. (Rio Tinto Opening Brief at 15–18.) For the reasons stated, these matters will be considered, if at all, after the threshold inquiry as to whether exhaustion should be prudentially required in this case has been completed.

sis before returning the matter to the circuit court so that the appellate court would have a full and complete record in deciding whether plaintiffs should be required to pursue local remedies as to any claim.[17]

## B. Whether Exhaustion Should be Prudentially Required in This Case

### 1. Strength of the Nexus Between Plaintiffs' Claims and the United States

In *Rio Tinto IV*, Judge McKeown made the following observation with respect to the nexus between plaintiffs' claims and the United States:

"This [case] . . . lacks the traditional bases for exercising our sovereign jurisdiction to prescribe laws, namely nationality, territory, and effects within the United States. See RESTATEMENT (THIRD) [FOREIGN RELATIONS LAW OF THE UNITED STATES] § 403(2) at cmt. d [ (1987) ] (stating jurisdiction is appropriately exercised with respect to activity outside the state that has or intends

to have substantial effect within the state's territory). The lack of a significant U.S. 'nexus' is an important consideration in evaluating whether plaintiffs should be required to exhaust their local remedies in accordance with the principle of international comity." *Rio Tinto IV*, 550 F.3d at 831.

Examining the accepted bases for jurisdiction to prescribe set forth in section 402 of the Restatement, Rio Tinto adds that plaintiffs' claims have nothing to do with "conduct that, wholly or in substantial part, takes place within [U.S.] territory," RESTATEMENT § 402(1)(a); that they do not implicate "the status of persons, or interests in things, present within its territory," *id.*, § 402(1)(b); and that they are not premised on "conduct outside [the U.S.'s] territory that has or is intended to have substantial effect within its territory," *id.* § 402(1)(c).[18] Defendants also argue that no U.S. national is a party to this action, such that there might be a basis for exercising jurisdiction to prescribe under section 402(2).[19] Finally, Rio Tinto asserts that plaintiffs' allegations do not involve

---

**17.** See *Rio Tinto IV*, 550 F.3d at 837 (Bea, J., concurring) ("I would require the district court to consider (1) whether Sarei had local remedies and exhausted them and (2) whether such exhaustion would be futile or otherwise inadequate—not merely require the court to decide whether to conduct this two-step analysis [as does the plurality]"); *id.* at 841 (Reinhardt, J., dissenting) ("The plurality opinion remands this action to the district court to consider whether this is a case in which prudential exhaustion analysis should be applied, and, if so, whether plaintiffs should be required to exhaust their remedies in Papua New Guinea before proceeding further in the district court"); see also *id.* at 832 (McKeown, J.) ("As a preliminary matter, to 'exhaust,' it is not sufficient that a plaintiff merely initiate a suit, but rather, the plaintiff must obtain a final decision of the highest court in the hierarchy of courts in the legal system at issue, or show that the state of the law or availability of remedies would make further appeal futile. [] Another basic element is that the remedy must be available, effective, and not futile. [] To measure effec-

tiveness, a court must look at the circumstances surrounding the access to a remedy and the ultimate utility of the remedy to the petitioner. . . . A judgment that cannot be enforced is an incomplete, and thus ineffective, remedy. The adequacy determination will also necessarily include an assessment of any delay in the delivery of a decision" (citations omitted)).

**18.** Rio Tinto Opening Brief at 3.

**19.** This section states, in relevant part, that "a state has jurisdiction to prescribe law with respect to . . . the activities, interests, status, or relations of its nationals outside as well as within its territory." RESTATEMENT § 402(2). Although, as noted, plaintiffs allege that Sarei is a lawful permanent resident ("LPR") of the United States, Rio Tinto asserts that LPR status is not synonymous with the term "U.S. national," and thus that Sarei's residence does not provide a basis for plaintiffs to invoke jurisdiction to prescribe under this section. (Rio Tinto Opening Brief at 3 n. 2

"conduct outside [U.S.] territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests," RESTATEMENT § 402(3).[20]

In response, plaintiffs assert that "[a]ny challenge to the sufficiency of nexus in this case must be made with the understanding that every ATS case will involve claims by an alien for a tort committed in violation of the law of nations."[21] They argue that "[w]hat Rio asks this Court to do is defer to factors articulated in the Restatement in order to determine the wisdom and legitimacy of the ATS itself."[22] Because the ATCA provides jurisdiction in U.S. courts when (1) an alien sues (2) for a tort (3) committed in violation of the law of nations, plaintiffs contend that "[a]ny threshold requirements suggested for jurisdiction by the Restatement that are in tension with the very language of the ATS cannot seriously be considered."[23] Given these requirements for stating a claim under the ATCA, plaintiffs maintain that

"neither [their] citizenship status [ ], nor [their] physical location [ ] at the time they suffered violations of customary international law, is determinative on the question of 'nexus' to the United States."[24] Plaintiffs also observe that the Ninth Circuit has held that courts "are constrained by what § 1350 shows on its face: no limitations as to the citizenship of the defendant, or the locus of the injury." *In re Estate of Ferdinand E. Marcos Human Rights Litigation (Trajano v. Marcos)*, 978 F.2d 493, 500 (9th Cir.1992).

Plaintiffs contend that, rather than focusing on the Restatement factors, the nexus inquiry must examine the ties Rio Tinto has to the United States as well as the "strong United States interest in vindicating international human rights violations" committed by companies acting abroad.[25] Plaintiffs argue that Rio Tinto is a multinational mining group that has its largest concentration of assets in the United States; that has operations in at least fifty countries worldwide, including the

---

(citing 8 U.S.C. § 1101(a)(3); *Perdomo–Padilla v. Ashcroft*, 333 F.3d 964, 967–71 (9th Cir.2003); and RESTATEMENT § 212).) Additionally, Rio Tinto contends that, as a corporation's nationality "is that of the state under whose law it is organized," RESTATEMENT § 213; *id.* § 402 cmt. e, Rio Tinto plc is a British corporation, and Rio Tinto Limited is an Australian corporation. (Rio Tinto Opening Brief at 3 n. 1.) It also notes that neither corporation maintains a principal place of business in the United States, which is one basis for assessing "nationality" in the context of diversity jurisdiction. (*Id.*)

**20.** Rio Tinto Opening Brief at 3.

**21.** Plaintiffs' Reply at 10.

**22.** *Id.* at 11.

**23.** *Id.* (citing *Wiwa v. Royal Dutch Petroleum Co.*, 626 F.Supp.2d 377, 381–82 (S.D.N.Y. 2009)) (quoting *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1995) (identifying the "first," "second," and "third" "ATS conditions")); see also *id.* at 12 ("Jurisdictional require-

ments of the ATS itself cannot logically be weighed as factors held against Plaintiffs in determining whether a sufficient nexus exists—the ATS is not itself under scrutiny").

**24.** *Id.* at 12; see also Plaintiffs' Opening Brief at 18–21; *id.* at 21 ("[N]either the citizenship status of the Plaintiffs, nor the physical location of Plaintiffs at the time they suffered violations of customary international law, is determinative on the question of 'nexus' to the United States. Were these considerations determinative, the ATS would have no force or effect, and the legion of precedential case law permitting foreign plaintiffs to litigate under the ATS for offenses committed abroad would be swept away. The holding in *Sosa* precludes Rio from arguing that extraterritorial torts affecting non-citizens cannot be adjudicated here [in the United States] under the ATS").

**25.** *Id.* at 21 (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 339 (S.D.N.Y.2003)).

United States; that owns a California corporation, U.S. Borax; that obtained much of the original funding for its Panguna mining operations in PNG from the Bank of America; and that maintains American Depository Receipt facilities at the Bank of New York.[26] Put differently, plaintiffs argue that the presence of adequate minimum contacts between Rio Tinto and the United States for personal jurisdiction purposes demonstrates that this case has an adequate "nexus" to the United States.

■ The court concludes that "nexus" is most sensibly evaluated in the ATCA context by consideration of a spectrum or range (weakest to strongest) of contacts or connections, not as an absolute. In assessing where on that spectrum a particular ATCA case falls, courts should consider the Restatement factors outlined above, other pertinent connections between the United States and the parties and/or claims, and the scope and purpose of the ATCA itself.[27] Viewed in this manner, the parties' positions are reconcilable and reflect a variety of factors, all of which are properly considered in testing the strength of the "nexus" between an ATCA plaintiff or his claims and a United States forum.

The *Rio Tinto IV* plurality commented that the nexus between plaintiffs' claims here and the United States appeared to be weak given that Rio Tinto is a foreign corporation; that the acts in question occurred exclusively on foreign soil; and that the violations alleged were directed at aliens, virtually all of whom have no connection with the United States. See *Rio Tinto IV*, 550 F.3d at 831 (McKeown, J.) ("The lack of a significant United States 'nexus' to the allegations here stimulates the comity response. These claims involve a foreign corporation's complicity in acts on foreign soil that affected aliens (though at least one of them—Sarei—has enjoyed the status of a lawful permanent resident of this country for some time now)").[28] Balanced against these factors are Rio Tinto's connections to the United States. The court agrees with plaintiffs that these merit consideration, although it does not agree that they are dispositive in assessing the strength of the "nexus" between this dispute and an American forum. This is particularly true since most of Rio Tinto's connections to the United States have nothing to do with plaintiffs' claims.[29]

---

**26.** *Id.* at 21–24.

**27.** None of the concurring or dissenting members of the *Rio Tinto IV* en banc panel endorsed or joined in Judge McKeown's analysis regarding the weight to be afforded the Restatement factors in evaluating nexus. Consequently, it does not appear that her views regarding the subject are binding on remand. See, e.g., *Alperin v. Vatican Bank*, 410 F.3d 532, 552 n. 13 (9th Cir.2005) ("Abiding by the rule that when 'no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds,'" *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotation marks omitted)). As a result, the plurality's analysis serves as a useful starting point in evaluating "nexus," but does

not preclude consideration of other factors. The court concurs with the plurality that the Restatement factors are relevant; it also finds persuasive plaintiffs' arguments that the specific purpose and jurisdictional requirements of the ACTA (e.g., that suit be filed by an alien) caution against limiting the nexus inquiry to the Restatement factors, or applying them in an overly rigid fashion.

**28.** Plaintiffs note that Sarei's wife is a putative class member acting on behalf of her deceased son, who was killed in the Bougainville conflict. They assert that Mrs. Sarei is a United States citizen, and that her son was as well. (Plaintiffs' Opening Brief at 18 n. 25.)

**29.** Rio Tinto concedes that its "ownership of U.S. companies might be relevant to nexus if those companies were involved in the challenged conduct." (Rio Tinto Reply at 8.)

Plaintiffs represent that the government of PNG and the Autonomous Bougainville Government, now established on that island,[30] have confirmed that they do not oppose the court's exercise of ATCA jurisdiction over plaintiffs' claims; they present several letters sent by PNG and Bougainvillean officials to the U.S. ambassador to PNG confirming this fact.[31] These submissions show that, as early as 2003, the PNG government advised the United States that it neither "support[ed] nor den[ied] the constitutional rights of [its] citizens [to] tak[e] whatever action they deem[ed] necessary" with respect to the claims asserted in this suit.[32] In 2005 and again in 2009, PNG officials reaffirmed this position, explaining that the PNG government was "not a party to this case," and did "not see the case presently before the courts in the U.S. affecting diplomatic and bilateral relations between our two countries." The government also stated that it did not believe the lawsuit "affect[ed] the peace process on the island of Bougainville." [33] In a letter to the U.S. ambassador to PNG, the Acting Chief Administrator for the Autonomous Bougainville Government communicated his government's belief that "the case should be heard and

**30.** Under the Bougainville Peace Agreement signed August 30, 2001, Bougainville's autonomy will increase over time, as it will "operat[e] under a home-grown Bougainville Constitution with a right to assume increasing control over a wide range of powers, functions, personnel and resources on the basis of guarantees contained in the National [PNG] Constitution." See Bougainville Peace Agreement at 1, available at http://www.google.com/# hl=en&q=bougainville + peace + agreement&aq=0&oq=bougainville +peace + &aqi=g4&fp=kE0CVI1PqvM (last visited July 2, 2009). A referendum on independence from Papua New Guinea will take place between 2015 and 2020. See, e.g., *Asia: Explosive Mines; Bougainville,* THE ECONOMIST (LONDON), Feb. 9, 2008, at 61. In June 2005, an Autonomous Bougainville Government was elected and assumed power. See, e.g., Lloyd Jones, *Island Ready for Self–Rule,* COURIER MAIL (AUSTRALIA), June 15, 2005, at 12. More recently, the Autonomous Government of Bougainville and PNG signed a memorandum of understanding, which contemplates that PNG will transfer power over minerals and oil and gas resources to Bougainville, as well as lift a moratorium on mining to boost economic development. See, e.g., Elisabeth Behrmann, *PNG's Bougainville Paving Way for Copper, Gold Exploration,* DOW JONES NEWSWIRES, May 2, 2008. The entity created by the Bougainville government to oversee these resources—the Bogenvil Resources Development Corporation, Ltd. ("BRDC")—will not deal with Panguna-related mining issues, however, as they remain politically volatile. *Id.*

**31.** Plaintiffs' Opening Brief at 13–14 ("In 2002, both the U.S. Government and the PNG Government expressed opposition to the litigation proceeding in the United States. Since the end of the conflict, however, ... the government of Papua New Guinea [has] confirmed that it [does] not oppose the litigation and that it would not effect diplomatic or bilateral relations. The Autonomous Bougainville Government agrees and takes the view that the case 'should be heard and decided by courts in the United States'" (record citations omitted)). See Berman Decl., Exh. A (letter from Patrick Koles, Acting Chief Administrator for the Autonomous Bougainville Government, to Leslie Rowe, Ambassador at the United States Embassy in Papua New Guinea (May 26, 2009)); B (letter from Margaret L. Elias, the Chief Secretary to Government of Papua New Guinea to Leslie Rowe, Ambassador at the United States Embassy in Papua New Guinea (February 11, 2009)); C (letter from Joshua Kalinoe, then-Chief Secretary to Government of Papua New Guinea to Robert Fitts, then-Ambassador at the United States Embassy in Papua New Guinea (March 30, 2005)); and D (letter from Joshua Kalinoe, then-Chief Secretary to Government of Papua New Guinea to Susan Jacobs, then-Ambassador at the United States Embassy in Papua New Guinea (February 6, 2003)).

**32.** Berman Decl., Exh. D.

**33.** Berman Decl., Exhs. B & C.

decided by courts in the United States as the citizens have exercised their rights to have the case heard there." [34] The Administrator noted that "if the case is not heard [in the U.S.], [this] will result in further delays, frustrations and likelihood of prejudices to [the] rights and interests of Plaintiffs and us all." [35] Finally, he commented that the Bougainville government did "not see the case presently in U.S. Courts adversely affecting any relations between [it] and [the] United States." [36]

The fact that PNG and the Autonomous Bougainville Government do not oppose litigation of plaintiffs' claims in the United States does not strengthen the nexus between the claims and the United States. Similarly, evidence that the United States no longer opposes litigation in this forum [37] does not change the fact that the nexus between the claims and the United States is weak in terms of nationality, territory, and effects within this country.

Rio Tinto argues that, given the fact that "[i]nternational law imposes a duty on all states to provide effective judicial processes and remedies for the violation of norms reflecting matters of universal concern," comity requires that the United States "respect ... PNG as a co-equal sovereign" and "allow PNG to fulfill its obligation" to adjudicate the claimed human rights violations. [38] It asserts the United States and its courts "cannot ignore [this] obligation [to respect another nation's sovereignty simply because that nation] 'consent[s]' to a U.S. forum." Ultimately, Rio Tinto concludes that, since no "government can[ ] opt out of its sovereign duty to provide remedies for violations of customary international law," the fact that PNG and the Autonomous Bougainville Government do not oppose litigation of the case in this court does not preclude imposition of a prudential exhaustion requirement or application of the traditional two-step exhaustion analysis. [39]

**34.** Berman Decl., Exh. A.

**35.** *Id.*

**36.** *Id.*

**37.** In September 2006, the U.S. government submitted an *amicus curiae* brief to the Ninth Circuit, in which it explained:
 "At the request of the district court, in November 2001, the Government filed a statement of interest, presenting the State Department's views about the effect this litigation would have on the Bougainville peace process and the conduct of the United States' foreign relations. That statement was based on the State Department's assessment of the Government's foreign relations interests and the peace process as they existed in 2001, which are different from the interests and circumstances that exist today."
 (See Rio Tinto's Supplemental Request for Judicial Notice in Support of Reply Brief on the Limited Remand Issue, Exh. 46 ("Brief for the United States as Amicus Curiae Supporting Panel Rehearing or Rehearing En Banc") at 14 n. 3.) Moreover, when pressed by the en banc panel to state whether continued adjudication of the action would nega-

tively affect foreign relations PNG or other U.S. interests, a representative of the Executive Branch confirmed that the U.S. government did not believe the case raised any "case-specific" political questions or unduly sensitive foreign affairs. (See Statement of the United States Government (Robert Loeb, Department of Justice) at oral argument before Ninth Circuit en banc panel (audio file located at http://www.ca9.uscourts.gov/ media/view_subpage.php?pk_id=0000001917), at 45:45 to 47:10 of oral argument (detailing government's then-current position regarding U.S. interests in this case).)

**38.** Rio Tinto Opening Brief at 5. Rio Tinto asserts that "[b]oth PNG and the U.S. have ratified the International Covenant on Civil and Political Rights ('ICCPR'), undertaking the obligation to provide and enforce remedies for persons whose rights recognized under international law are violated." (*Id.* at 4.)

**39.** *Id.;* see also Rio Tinto Reply at 13–14 ("A foreign government cannot, by writing a letter, avoid its obligation to adjudicate the claims of its citizens respecting human rights ... Comity means respecting PNG's duty to adjudicate these matters in its own courts in

The court agrees with Rio Tinto insofar as it asserts that the consent or non-opposition of PNG and the Autonomous Bougainville Government to having the litigation proceed in this forum does not strengthen the nexus between plaintiffs' claims and the United States. To the extent Rio Tinto suggests that comity considerations and international law obligations *require* the United States to defer to another sovereign's initial adjudication of claims involving matters of universal

concern, however, it adopts the position taken by Judges Bybee and Bea in their respective opinions.[40] Seven of the eleven judges who were members of the *Rio Tinto IV* en banc court rejected imposing a mandatory exhaustion requirement, however, and the plurality directed that the court "consider" whether exhaustion ought to be required in this action as a prudential matter.[41] Given the outcome of the en banc proceedings, Rio Tinto's argument that exhaustion is required is not persuasive.[42]

the first instance. That the current PNG government may or may not object to a U.S. court taking on this very difficult case has no relevance to the comity analysis underlying the exhaustion inquiry").

40. Compare, e.g., Rio Tinto Opening Brief at 6–7 ("Our national interest is that [universally accepted] norms be enforced, but not that the U.S. be the enforcing nation. The U.S. has no greater claim to the authority to enforce the norms of international law than other nations that are willing and able to do so") and Rio Tinto Reply at 14 ("Nor would the U.S. commitment to effective enforcement of international law be served by inquiring, case by case, into the foreign government's motives or preferences. The institutional interests at stake are best served by respecting each jurisdiction's duty to enforce claims based on customary international law") with *Rio Tinto III*, 487 F.3d at 1238–40 (Bybee, J., dissenting) ("First, requiring exhaustion of local remedies will promote respect for foreign tribunals or other processes for dispute resolution, such as commissions or political records.... Exhaustion recognizes the possibility of legislative, executive or judicial acts in another nation; it thus respects the processes by which another nation has constituted itself and is worthy to be considered part of the community of nations.... Taking up cases that can be handled domestically aggravates diplomatic and local tensions because it interferes with local control and stirs up unnecessary publicity.... By accepting jurisdiction over foreign suits that can be appropriately handled locally, the federal courts embroil the nation in a kind of judicial 'imperialism' that suggests the United States does not respect or recognize a foreign government's ability to administer justice" (citations omitted)) and *Rio Tinto IV*, 550 F.3d at 836–37 (Bea, J., concurring) ("A

mandatory requirement of exhaustion of local remedies, except where futile or otherwise unavailable, allows our courts to play the role the ATS intended them to play: an ultimate venue for claimed violations of the law of nations when those claimed violations cannot or will not be cured by the courts of the country in which the injuries occurred. The requirement simultaneously prevents our unelected judiciary ... from assuming the role of a roving sheriff in recurring, internecine disputes involving claims of inequity and oppression outside the United States" (citations omitted)).

41. Alternatively, Rio Tinto argues that the reasoning of decisions imposing prudential exhaustion in tribal and administrative law contexts "support[s] imposing an exhaustion requirement." (Rio Tinto Opening Brief at 26–30.) As with Rio Tinto's positions regarding comity, this argument overlooks the scope of the *Rio Tinto IV* plurality's remand, which, rather than *requiring* that the court impose an exhaustion requirement, directed the court to *consider* whether such a requirement was warranted *in this case*, given the weak nexus between plaintiffs' claims and the United States, principles of international comity, and the extent to which plaintiffs' claims involve matters of universal concern.

42. At the hearing, Rio Tinto's counsel argued that the nexus-universal concern inquiry could be conceptualized as a matrix. He opined that one quadrant of the matrix represented cases in which there was no (or very weak) nexus, and asserted that although, in such cases, jurisdiction lies to adjudicate violations of universal norms, an exhaustion requirement *must* be imposed. (See Reporter's

In sum, weighing the Restatement factors, the nature of Rio Tinto's contacts with the United States, and the relationship between the United States and plaintiffs and their claims, the court agrees with the en banc plurality that the nexus between plaintiffs' claims and the United States is weak.[43]

## 2. Matters of "Universal Concern"

"In ATS cases where the United States 'nexus' is weak, courts should carefully consider the question of exhaustion, particularly—but not exclusively—with respect to claims that do not involve matters of 'universal concern.'" *Rio Tinto IV*, 550 F.3d at 831 (McKeown, J.). Matters of "universal concern" are offenses "for which a state has jurisdiction to punish without regard to territoriality or the nationality of offenders." *Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir.1995); see also RESTATEMENT § 404 ("A state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern . . . even where none of the bases of jurisdiction indicated in § 402 [nationality, territory, and in-country effects] is present").

As the second step in evaluating whether exhaustion of some or all of plaintiffs' claims ought to be required as a prudential matter, therefore, the court examines the ATCA claims pleaded in the first amended complaint to ascertain whether they in-

Transcript of Proceedings ("RT"), Monday, July 6, 2009, at 19:22–20:8; *id.* at 37:7–16.) This argument is unavailing in light of *Rio Tinto IV*. The *Rio Tinto IV* plurality concluded that the nexus in this case was weak or nonexistent. It nonetheless evaluated the universality of the concerns raised by plaintiffs' claims, and discussed the need to balance the universality of the concerns against the nexus. Based on the language of the plurality opinion, the court concludes that the *Rio Tinto IV* plurality implicitly rejected defendants' position where nexus is weak, an exhaustion requirement must always be imposed. Had the plurality adopted or accepted defendants' analysis, it would have held that exhaustion was required once the court determined that the nexus was weak or nonexistent. It did not do so. Attempting to carry out the mandate of the Ninth Circuit's opinion, the court likewise declines to impose this type of exhaustion requirement.

**43.** This does not mean that every ATCA case will have a weak or relatively weak nexus with the United States simply because plaintiffs are aliens alleging violations of international law. Contrary to plaintiffs' assertions, the nexus inquiry does not necessarily undermine the scope or purpose of the ACTA, nor conflict with the elements of an ATCA claim. In a given case, certain of the Restatement factors might well weigh in favor of a finding that nexus was strong, or at least less attenuated than it is here. Violations of international law alleged by ACTA plaintiffs might have a substantial, direct, and foreseeable effect on the United States, for example, because there had been an influx of immigrants to the country seeking refuge from human rights abuses occurring elsewhere. This would result in a much stronger connection between the United States and "those whom [its] regulation [through adjudication] was designed to protect." Several of the Restatement factors, in fact, speak to the second factor the plurality identified as relevant to the prudential exhaustion analysis—i.e., the universality of the concerns implicated by plaintiffs' claims. See RESTATEMENT § 403(2) (identifying as relevant factors "the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted; . . . the importance of the regulation to the international political, legal, or economic system; . . . [and] the extent to which the regulation is consistent with the traditions of the international system"). Finally, even if a court determines that exhaustion ought be required as a prudential matter in a given ATCA case, defendants must still show that local remedies are available and that exhaustion will not be futile. Thus, a finding that nexus is weak does not necessarily mean that American courts will refuse to hear every ATCA case involving foreigners alleging torts against foreign corporations on foreign soil.

volve matters of "universal concern." [44] In doing so, the court finds instructive, but not controlling, the list of offenses denominated matters of universal concern in section 404 of the Restatement. Section 404 specifically states that the list set forth therein is not exhaustive. See RESTATEMENT § 404 ("A state has jurisdiction to define and prescribe punishment for certain offense recognized by the community of nations as of universal concern, *such as* ..." (emphasis added)); *id.*, cmt. a ("Universal jurisdiction for additional offenses is provided by international agreements ...").[45] Moreover, although evaluating whether to require prudential exhaustion—as envisioned by the plurality—is a separate inquiry from subject matter jurisdiction under the ACTA, neither the statute itself[46] nor cases interpreting it limit the claims that are actionable under the ATCA to the matters of universal concern identified in section 404. Therefore, while the Restatement offers some guidance in

evaluating the second prong of the plurality's prudential exhaustion test, it is not the sole source to which the court looks in assessing whether the claims asserted in this suit implicate matters of "universal concern."

Other useful reference points include Judge Reinhardt's observation that "heinous offenses like genocide, crimes against humanity, and war crimes" fall within ATCA jurisdiction because they violate specific " 'norm[s] of international character accepted by the civilized world' " that all nations have an interest in remedying. *Rio Tinto IV*, 550 F.3d at 845 (Reinhardt, J., dissenting) (citing *Sosa*, 542 U.S. at 742, 124 S.Ct. 2739 (Breyer, J., concurring)). All relevant sources indicate that, while the two inquiries are not coextensive, evaluating whether a claim involves a matter of "universal concern" for purposes of deciding whether to impose a prudential exhaustion requirement overlaps to some extent with the analysis required to ascertain

**44.** Rio Tinto argues that, following the Supreme Court's decision in *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), plaintiffs' complaint does not sufficiently plead that it aided and abetted violations of matters of universal concern. (Rio Tinto Opening Brief at 20–26.) This argument is unavailing for at least two reasons. First, Rio Tinto ignores the *limited* nature of the question before the court on remand, namely, whether as a prudential matter, an exhaustion requirement should be imposed in this case. An attack on the sufficiency of plaintiffs' pleadings, or the merits of their aiding and abetting claims, is beyond the scope of the remand. Cf. *Rio Tinto III*, 487 F.3d at 1200 (explaining that the initial jurisdictional inquiry in an ATCA case does not evaluate "[w]hether the cause of action [will] turn[] out to be well founded in law and fact," quoting *Bell v. Hood*, 327 U.S. 678, 683 n. 2, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). Second, *Iqbal* addressed a narrow issue: what pleading standard had to be satisfied to state a claim against an individual government official for purposeful discrimination in *Bivens* and § 1983 suits. Nothing in *Iqbal*

suggests that the pleading standard it articulates applies to ATCA claims; indeed, after *Twombly*, courts appear divided over the pleading standards applicable to § 1350 claims involving accomplice liability. See generally Amanda Sue Nichols, Note, *Alien Tort Statute Accomplice Liability Cases: Should Courts Apply the Plausibility Pleading Standard of Bell Atlantic v. Twombly?*, 76 FORDHAM L.REV. 2177 (2008).

**45.** See also, e.g., George K. Walker, *Principles for Collective Humanitarian Intervention to Succor Other Countries' Imperiled Indigenous Nationals*, 18 AM. U. INT'L L.REV 35, 77 (2002) ("The § 404 list is not exclusive, and certainly today would include crimes against humanity" (footnote omitted)).

**46.** In the years since *Sosa* was decided, Congress has not accepted Justice Souter's invitation to provide guidance regarding the scope of claims that are actionable under the ACTA. See *Sosa*, 542 U.S. at 731, 124 S.Ct. 2739. Hence, that decision and the standards it articulates for determining whether a particular claim is cognizable under the ACTA control.

whether a claim falls within ATCA jurisdiction, i.e., whether it is sufficiently "specific, universal, and obligatory." *In re Estate of Marcos Human Rights Litigation (Hilao v. Estate of Marcos)*, 25 F.3d 1467, 1475 (9th Cir.1994).

Although the primary focus of this prong of the prudential exhaustion analysis is universality, the specificity of a norm, and the extent to which nations feel obliged to follow it, inform a decision regarding its universality. It is thus appropriate to look to ATCA jurisprudence, "the works of jurists on public law, [ ] the general practice of nations, [and] court decisions that discuss and enforce international law," *Rio Tinto I*, 221 F.Supp.2d at 1131 (citations omitted), as well as the types of claims listed in section 404 of the Restatement, in evaluating whether a particular claim involves matters of "universal concern." Because a court evaluating the universality of a particular norm in the ATCA context must be sensitive to that norm "as it has evolved and exists among the nations of the world today," *Kadic*, 70 F.3d at 238 (citing *Filartiga v. Pena–Irala*, 630 F.2d 876, 887 (2d Cir.1980)), the court examines each of plaintiffs' claims in turn to ascertain whether it can currently be considered "universal." [47]

### (a) Crimes Against Humanity

■ Plaintiffs' first ATCA claim alleges that Rio Tinto "acted jointly and willfully with PNG and the government of Australia to institute a blockade of Bougainville," which constituted "genocide because it foreseeably resulted in the killing of natives, caused serious bodily harm, [and] was deliberately calculated to destroy plaintiffs and their way of life." [48] Plaintiffs also assert that the "instigation of the blockade and denial of medical treatment and other necessities that caused severe pain and suffering, as well as death, constitute acts of official torture." [49]

Both before and after *Sosa*, federal courts have recognized claims for certain crimes against humanity, including genocide and torture, as sufficiently universal to give rise to jurisdiction under the ATCA.[50] See, e.g., *Bowoto v. Chevron Corp.*, 557 F.Supp.2d 1080, 1084–85 (N.D.Cal.2008) ("The case at bar [ ] consid-

---

**47.** An approach that evaluates each claim in the operative complaint separately comports with prudential exhaustion practice in contexts such as habeas. See, e.g., *King v. Ryan*, 564 F.3d 1133, 1138 (9th Cir.2009) ("Habeas petitioners have long been required to adjudicate their claims in state court—that is, 'exhaust' them—before seeking relief in federal court. This requirement is 'grounded in principles of comity[,] as it gives states the first opportunity to address and correct alleged violations of state prisoner's federal rights.' The current statutory exhaustion requirement prevents a federal court from granting habeas relief 'unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State.' In 1982, the U.S. Supreme Court interpreted the exhaustion rule in the habeas context as requiring 'total exhaustion' of 'mixed' petitions—that is those petitions that contain both exh͙ ͙͙͙ and unexhausted claims. R^ ͙ ͙ ͙ ͙ ͙ S 509, 10? ͙ ͙

required district courts to dismiss a mixed petition, 'leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court' " (citations omitted)).

**48.** First Amended Complaint, ¶¶ 211, 213.

**49.** *Id.*, ¶ 214.

**50.** The specificity of a plaintiff's torture allegations is relevant in assessing whether the particular conduct on which a claim is based gives rise to ATCA jurisdiction. See, e.g., *Kiobel v. Royal Dutch Petroleum Co.*, 456 F.Supp.2d 457, 465 (S.D.N.Y.2006) ("*Sosa* leaves unclear what conduct is included within 'torture.' [ ] However, dictum in *Sosa* suggests that at least some forms of torture continue to provide a basis for actionable claims under the ATS").

ers whether common law claims of torture and summary execution can be pled against *corporations* under the ATS.... The Court finds that plaintiffs' claims for torture and summary execution may be brought under the ATS ..."); *Mujica v. Occidental Petroleum Corp.*, 381 F.Supp.2d 1164, 1183 (C.D.Cal.2005) (finding that a claim alleging crimes against humanity, based on the forced displacement of civilians, gave rise to ATCA jurisdiction); see also *Kadic*, 70 F.3d at 239–42 ("The Executive Branch has emphatically restated in this litigation its position that private persons may be found liable under the Alien Tort Act for acts of genocide, war crimes, and other violations of international humanitarian law.... In the aftermath of the atrocities committed during the Second World War, the condemnation of genocide as contrary to international law quickly achieved broad acceptance by the community of nations.... [F]rom its incorporation into international law, the proscription of genocide has applied equally to state and non-state actors"); *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n. 20 (D.C.Cir.1984) (Edwards, J., concurring) ("On the basis of international covenants, agreements and declarations, commentators have identified at least four acts that are now subject to unequivocal international condemnation: torture, summary execution, genocide and slavery" (citations omitted)).[51] Genocide, moreover, is one of the matters of "universal concern" identified in section 404 of the Restatement, and both genocide and crimes against humanity are among the "heinous crimes" mentioned by Judge Reinhardt in his dissent. As pled, therefore, plaintiffs' first claim for crimes against humanity amounting to genocide and torture implicates matters of universal concern.

### (b) War Crimes

■ Plaintiffs' second claim alleges that Rio Tinto's actions during the hostilities that occurred in Bougainville violated the international law of war and the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Article III.[52] War crimes are one of the matters of "universal concern" listed in section 404 of the Restatement, and federal courts have long recognized that alleged violations of the law of war give rise to an actionable ATCA claim. See, e.g., *Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 116 (2d Cir.2008) ("While not exhaustive, the list of principles that may be said to have 'ripened into universally accepted norms of international law' [ ] includes the proscriptions against piracy, slave trade, attacks on or hijacking of aircraft, genocide, and war crimes" (citing *Kadic* and RESTATEMENT § 404)); *Kadic*, 70 F.3d at 242–43 ("After the Second World War, the law of war was codified in the four Geneva Conventions, which have been ratified by more than 180 nations, including the United States [ ]. Common article 3, which is substantially identical in each of the four Conventions, applies to 'armed conflict[s] not of an international character.' ... Thus, under the law of war as codified in the Geneva Conventions, all 'parties' to a conflict ... are obliged to adhere to these most fundamental requirements of the law of war. The liability of

---

**51.** See also, e.g., *Rio Tinto IV*, 550 F.3d at 831 (McKeown, J.) ("Some of the claims—torture, crimes against humanity, and war crimes—may implicate matters of 'universal concern' ..."); *Rio Tinto III*, 487 F.3d at 1202 ("Plaintiffs here have alleged several claims asserting *jus cogens* violations that form the least controversial core of modern ATCA jurisdiction, including allegations of war crimes, crimes against humanity and racial discrimination"); *Rio Tinto I*, 221 F.Supp.2d at 1150–51 ("Genocide is a recognized crime against humanity").

**52.** First Amended Complaint, ¶¶ 220–21.

private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg ... and remains today an important aspect of international law. [ ] The District Court has jurisdiction pursuant to the Alien Tort Act over appellants' claims of war crimes and other violations of international humanitarian law" (footnotes and citations omitted)); *Jane Doe I v. Islamic Salvation Front (FIS)*, 993 F.Supp. 3, 8 (D.D.C.1998) ("This court concludes that the acts of the FIS alleged by Plaintiffs are proscribed by international law against both state and private actors, as evidenced by Common Article 3. Accordingly, Plaintiffs have properly alleged subject matter jurisdiction under the ATCA"). Plaintiffs' second claim, therefore, also involves a matter of "universal concern."

### (c) Environmental Tort Claims

The first amended complaint includes two distinct environmental tort claims: the third claim alleges violations of the rights to life, health, and security while the sixth alleges violations of international environmental rights.

Plaintiffs allege that the right to life "is specifically applicable to cases involving severe environmental harm";[53] that the right to health "constitutes a norm of customary international law";[54] and that international law recognizes "that harm which threatens human life or health necessarily implicates a violation of the right to security of the person."[55] They assert that Rio Tinto violated their rights to life and health "by appropriating land owned by indigenous people for the purpose of opening a mine, [and by] knowingly emitting and depositing volatile and highly toxic mine waste onto the land and into the water, thus destroying rivers and land that provided a way of life for the native people."[56]

In *Rio Tinto I*, the court concluded that, although various international law treaties and/or agreements reference the rights to life and health, and some address the impact environmental degradation has on those rights, there was insufficient international consensus regarding the type of conduct that violated the rights for purposes of ACTA jurisdiction. *Rio Tinto I*, 221 F.Supp.2d at 1158.[57] Additionally, the court considered relevant in assessing the universality of the rights the fact that the United States had refused to ratify at least one of the treaties that recognize them. *Id.* at 1157–58. Ultimately, the court was unable to conclude that the rights to life and health were rights that other nations universally recognized could be violated through conduct harmful to the environment. *Id.* at 1158 (citing *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527(VLB), 1994 WL 142006, *7 (S.D.N.Y. Apr. 11, 1994) ("Not all conduct which may be harmful to the environment, and not all violations of environmental laws, constitute violations of the law of nations")); see also, e.g., *Beanal v. Freeport–McMoran, Inc.*, 197 F.3d 161, 167 (5th Cir.1999) (rejecting plaintiffs' reliance on "several sources of international environmental law to show that the alleged environmental abuses caused by Freeport's mining activities are cognizable under international law," the court explained that "Beanal fails to show that these treaties and agreements enjoy universal acceptance in the international community. The sources of international law cited by Bea-

---

53. First Amended Complaint, ¶ 227.

54. *Id.*, ¶ 228.

55. *Id.*, ¶ 229.

56. *Id.*, ¶ 230.

57. The court also found that the rights were not sufficiently specific to support ATCA jurisdiction. *Rio Tinto I*, 221 F.Supp.2d at 1158.

nal and the *amici* merely refer to a general sense of environmental responsibility and state abstract rights and liberties devoid of articulable or discernable standards and regulations to identify practices that constitute international environmental abuses or torts").

■ Since *Rio Tinto I*, federal courts have continued to hold that, at present, claims that environmental damage or destruction has injured or threatened individuals' rights to life and health are not sufficiently specific to give rise to ATCA jurisdiction. Courts so holding have recognized that this lack of specificity, and nations' differing interpretations of the conduct that violates the rights, undercuts any claim that they are universal. This is because nations cannot universally subscribe to a principle that is without concrete content. See, e.g., *Bowoto*, 557 F.Supp.2d at 1095 ("The right to life, liberty and security of person are widely recognized as fundamental human rights. However, these international instruments do not purport to define these rights nor is there ATS jurisprudence upholding or defining such claims"); *Kiobel v. Royal Dutch Petroleum Co.*, 456 F.Supp.2d 457, 467 (S.D.N.Y.2006) ("Defendants argue that there is no particular or universal understanding of the civil and political rights [to life, liberty, security and association] covered by Plaintiffs' claim, and thus, pursuant to *Sosa*, these 'rights' are not actionable under the ATS. [ ] The Court agrees"); *In re Agent Orange Product Liability Litigation*, 373 F.Supp.2d 7, 129 (E.D.N.Y.2005) ("In the developing area of international environmental law, the United States and other nations have tended to treat protection of the environment on an ad-hoc, situation-by-situation and case-by-case basis" (citations omitted)); see also *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 254–55 (2d Cir.2003) (holding, in a suit where Peruvian residents alleged that pollution from an American mining company's operations had caused severe, deadly lung disease, that general statements regarding the rights to life and health "are boundless and indeterminate. They express virtuous goals understandably expressed at a level of abstraction needed to secure the adherence of States that disagree on many of the particulars regarding how actually to achieve them.... For the foregoing reasons, plaintiffs have failed to establish the existence of a customary international law 'right to life' or 'right to health' "); *id.* at 266 ("Because plaintiffs have failed to submit evidence sufficient to establish that intranational pollution violates customary international law, the District Court properly granted defendant's motion to dismiss"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 340 (S.D.N.Y. 2003) ("[I]t is well-established that environmental damage, without more, generally does not violate international law" (citations omitted)).

As a result, the court concludes that plaintiffs' third claim that Rio Tinto's alleged environmental destruction of Bougainville violated their rights to life, health, and security of the person is based on international law norms that have not, as yet, achieved the status of matters of "universal concern."[58]

Plaintiffs' sixth claim alleges that international law "has recognized a minimum

---

**58.** As the court noted in *Rio Tinto I*, where the conduct alleged to violate the rights to life, health and security of the person is torture, summary execution or disappearance, courts have recognized the universal nature of the claim. See *Rio Tinto I*, 221 F.Supp.2d at 1158 n. 174. This is consistent with the court's conclusion that plaintiffs' crimes against humanity claim involves matters of "universal concern."

right to a safe environment as a customary norm."[59] In *Rio Tinto I*, the court concluded that some of the authorities cited in the complaint as support for this claim, particularly the Rio Declaration and the Stockholm declaration, undermined plaintiffs' position that defendants' conduct violated recognized international law. *Rio Tinto I*, 221 F.Supp.2d at 1159. It also evaluated the additional bases for the environmental tort claims that plaintiffs had raised in their opposition to defendants' motion to dismiss. *Id.* at 1160. These included the "principle of sustainable development," a concept the court found insufficiently "specific, universal, and obligatory" to support a claim for violation of the law of nations. It noted, in fact, that plaintiffs' expert conceded the principle might be "'too broad a concept to be legally meaningful.'" *Id.*

The court next considered whether plaintiffs' allegations stated a claim for violation of the United Nations Convention on the Law of the Sea ("UNCLOS"), and whether, if so, such a claim fell within its jurisdiction under the ACTA. Ultimately, the court held that "[b]ecause UNCLOS reflects customary international law, plaintiffs may base an ATCA claim upon it." *Id.* at 1162.

While the UNCLOS may reflect customary international law that is specific and obligatory, the court concludes—for purposes of applying the second prong of the prudential exhaustion analysis—that it is not a "matter of universal concern" in the same manner that *jus cogens* norms such as genocide, torture or crimes against humanity are.[60] This conclusion is bolstered by the fact that the United States has signed but not yet ratified UNCLOS. For these reasons, the court finds that plaintiffs' international environmental rights claims, including those premised on the UNCLOS, involve norms "where aspiration has not yet ripened into obligation," *Alvarez–Machain v. United States*, 331 F.3d 604, 620 (9th Cir.2003), reversed on other grounds sub. nom. *Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). It thus concludes that the claims do not implicate matters of "universal concern."

### (d) Racial Discrimination

Plaintiffs' fourth ATCA claim for racial discrimination alleges that Rio Tinto "viewed the people of Bougainville as inferior due to their color and culture and, therefore, intentionally violated their rights."[61] It also asserts that Rio Tinto

---

59. First Amended Complaint, ¶ 255.

60. This conclusion is further supported by the fact that significant disagreement exists among developed and developing nations as to the appropriate reach of international environmental regulation. See, e.g., Andrew P. Morriss & Roger E. Meiners, *Borders and the Environment*, 39 ENVTL. L. 141, 142–45 (2009) ("One group of environmental protection advocates, typically those in developed countries with relatively stringent environmental protection laws, argues that countries with less stringent protection laws should raise their standards to the higher, developed-world standards.... The second reaction, also largely by environmental groups from wealthy nations, has been to call for international institutions to set standards for environmental

protection to eliminate a 'race to the bottom' among jurisdictions. The Kyoto Protocol, for example, attempts to set levels of carbon dioxide emissions by signatories. Similarly, the World Trade Organization (WTO) has been moving gradually to include environmental standards as a regular part of trade agreements. Such agreements also tend to emphasize the need for less-developed countries to impose more stringent environmental standards domestically. The third reaction, largely from interest groups and governments in emerging nations focused on improving the economic welfare of the poor, is to argue that developing countries should not be expected to bear the burden of restricting emissions to the same degree as developed economies").

61. First Amended Complaint, ¶ 239.

had "a deliberate policy of systematic racial discrimination against plaintiffs." [62] Plaintiffs contend that, because defendants acted under color of law in concert with the PNG government, their "discriminatory acts [ ] constitute governmental action." [63]

■ As the court noted in *Rio Tinto I*, "it is well-settled that racial discrimination is a violation of the law of nations." Many courts have held, in fact, that discrimination "violates a *jus cogens* norm." *Rio Tinto I*, 221 F.Supp.2d at 1152 (citations omitted).[64] Racial discrimination is proscribed by international law only when committed by state officials or under color of law, however. *Id.* at 1153 (citing RESTATEMENT § 702 ("[a] *state* violates international law if, as a matter of state policy, it practices, encourages, or condones ... systematic racial discrimination")); see also, e.g., *Bigio v. Coca–Cola Co.*, 239 F.3d 440, 448 (2d Cir.2000) ("However reprehensible, [ ] racial or religious discrimination ... are included only in [§ 702] of the Restatement, which describe[s] conduct that violates international law when undertaken by a *state actor*" (citations omitted)); *In re South African Apartheid Litigation*, 617 F.Supp.2d 228, 250 (S.D.N.Y. 2009) ("Racial discrimination is a violation of customary law when it is practiced systematically as a matter of state policy" (footnotes and internal quotations omitted)).

While the *Bigio* court held that "neither racial or religious discrimination in general

nor the discriminatory expropriation of property in particular is listed as an act 'of universal concern' in [section] 404 or is sufficiently similar to the listed acts for us to treat them as though they were incorporated into [section] 404 by analogy," *Bigio*, 239 F.3d at 448, it did so in the context of concluding that a private company could not be sued for discrimination under the ACTA when it had not acted in concert with state officials. See also *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 444 (D.N.J.1999) ("The *Kadic* Court further noted that section 702 [of the Restatement] ... identifies violations that are actionable when committed by a state, whereas section 404 of the Restatement lists a more limited category of violations of universal concern").

Although the plurality opinion directed the court to weigh nexus against the universality of the concerns underlying plaintiffs' claims in assessing whether to impose a prudential exhaustion requirement, *Rio Tinto IV*, 550 F.3d at 824, 831, and although it cited section 404 of the Restatement as defining matters of "universal concern," *id.*, for the reasons stated earlier, the court does not believe that the plurality intended that the definition set forth in section 404 strictly control the prudential exhaustion analysis.

The court is mindful, moreover, of the panel's decision in *Rio Tinto III*, which held that "[a]cts of racial discrimination are violations of *jus cogens* law." *Rio Tinto III*, 487 F.3d at 1209 (citing *Sider-*

---

62. *Id.*, ¶ 238.

63. *Id.* See also *Rio Tinto I*, 221 F.Supp.2d at 1151–52 ("Plaintiffs contend that, given PNG's substantial financial interest in the Panguna Mine, defendants acted under color of state authority in discriminating against the people of Bougainville"); see *id.* at 1154 (noting that plaintiffs alleged "that PNG made its governmental power of eminent domain available to Rio Tinto so that it could build the

mine, and that, because of its profit participation in the mine, PNG took no steps to control or minimize the negative impact of Rio Tinto's mining operations").

64. *Jus cogens* norms "proscribe a limited set of activities so universally condemned by the international community that they cannot be undertaken under any circumstances." *Hirsh v. State of Israel*, 962 F.Supp. 377, 381 (S.D.N.Y.1997) (internal quotations omitted).

*man de Blake v. Republic of Argentina,* 965 F.2d 699, 717 (9th Cir.1992), for the proposition that "the Foreign Relations Law Restatement 'identif[ies] jus cogens norms prohibiting ... systematic racial discrimination' "); see *Siderman de Blake,* 965 F.2d at 715 ("Courts seeking to determine whether a norm of customary international law has attained the status of *jus cogens* ... must ... determine whether the international community recognizes the norm as one 'from which no derogation is permitted' "); *Presbyterian Church of Sudan,* 244 F.Supp.2d at 306 ("The Amended Complaint is rife with accusations which, if proven true, would constitute behavior manifestly in violation of the most basic rules of international law and, indeed, of civilized conduct. Such acts violate peremptory norms, or *jus cogens*.... Violations of *jus cogens* norms constitute violations of obligations owed to all ('*erga omnes*'). In other words, states may exercise universal jurisdiction over acts committed in violation of *jus cogens* norms"). Because racial discrimination violates a *jus cogens* norm, the court concludes that it should be treated as a matter of universal concern for purposes of evaluating whether to impose a prudential exhaustion requirement with respect to plaintiffs' fourth ACTA claim.

#### (e) Cruel, Inhuman, and Degrading Treatment

Plaintiffs' fifth claim for cruel, inhuman, and degrading treatment ("CIDT") asserts that, by subjecting plaintiffs to inhumane treatment causing "lasting emotional, psychological and physical trauma," Rio Tinto violated Article 16 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Pun-

ishment ("CAT").[65] Specifically, plaintiffs alleged that "Rio's blockage, massive environmental destruction, and seizure of property for Rio's purposes constitutes cruel, inhuman and degrading treatment."

In its original motion to dismiss, Rio Tinto did not argue that plaintiffs' CIDT claim should be dismissed. Examining its subject matter jurisdiction to hear the claim *sua sponte,* the court noted that it was not based on allegations of torture and that plaintiffs had not "articulated a specific, universal and obligatory norm underlying th[e] claim." *Rio Tinto I,* 221 F.Supp.2d at 1163 n. 190 (citing *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1543 (N.D.Cal.1987), superseded by statute on other grounds as stated in *Papa v. United States,* 281 F.3d 1004 (9th Cir.2002); *Forti v. Suarez–Mason,* 694 F.Supp. 707, 712 (N.D.Cal.1988); and *Hilao v. Estate of Marcos,* 103 F.3d 789, 794–95 (9th Cir. 1996)).

More recently, however, federal courts have begun to recognize that "there exists a universal, definable, and obligatory prohibition against cruel, inhuman, or degrading treatment or punishment," and that CIDT "is therefore actionable under the ATCA." *Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 452 F.3d 1284, 1285 (11th Cir.2006) (Barkett, J., dissenting). See also, e.g., *Doe v. Qi,* 349 F.Supp.2d 1258, 1321–22 (N.D.Cal.2004) (stating that CIDT has been condemned by numerous sources of international law and holding that where the conduct alleged in a particular case to constitute CIDT is sufficiently egregious, it gives rise to jurisdiction under the ATCA); *Tachiona v. Mugabe,* 234 F.Supp.2d 401, 437 (S.D.N.Y.2002) ("Despite the absence of a distinct definition for

**65.** First Amended Complaint, ¶¶ 249–50, 252. Article 16 of the CAT provides: "Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punish-

ment which do not amount to torture as defined in article I, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

what constitutes cruel, inhuman or degrading treatment, various authorities and international instruments make clear that this prohibition is conceptually linked to torture by shades of misconduct discernible as a continuum.... That it may present difficulties to pinpoint precisely where on the spectrum of atrocities the shades of cruel, inhuman, or degrading treatment bleed into torture should not detract from what really goes to the essence of any uncertainty: that, distinctly classified or not, the infliction of cruel, inhuman or degrading treatment by agents of the state, as closely akin to or adjunct of torture, is universally condemned and renounced as offending internationally recognized norms of civilized conduct").

Acknowledging that there "is no widespread consensus regarding the elements of cruel, inhuman and degrading treatment," one California district court has concluded that CIDT claims "may be brought under ATS if the specific conduct alleged by the plaintiffs has been universally condemned as cruel, inhuman, or degrading." *Bowoto*, 557 F.Supp.2d at 1093–94 (citing *Qi*, 349 F.Supp.2d at 1322; and *Xuncax v. Gramajo*, 886 F.Supp. 162, 187 (D.Mass.1995)).

"Cruel, inhuman, or degrading treatment or punishment is defined as acts which inflict mental or physical suffering, anguish, humiliation, fear and debasement, which fall short of torture." *Aldana*, 452 F.3d at 1285 n. 1 (Barkett, J., dissenting) (citing the CAT). The principal difference between torture and CIDT is "the intensity of the suffering inflicted." RESTATEMENT, § 702, Reporter's Note 5 (quoting *Ireland v. United Kingdom*, 25 Pub. Eur. Ct. Hum. Rts., ser. A para. 167 (1978)); see also *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 CIV. 8386(KMW), 2002 WL 319887, *8 (S.D.N.Y. Feb. 28, 2002) ("International law considers 'cruel, inhuman or degrading treatment' as a general cate-

gory of prohibited conduct of which 'torture is at the extreme end' ").

■ Here, plaintiffs' CIDT claim is based on a wide range of conduct, including seizure of Bougainvilleans' property and displacement from their homes, environmental damage, and the Rio Tinto's alleged role in the blockade of the island during the civil war. Some of this conduct may implicate matters of universal concern (e.g., the medical blockade), while some does not (e.g., damage to the environment). The CIDT claim that plaintiffs have asserted is thus in many respects different from those that courts have found "closely akin to ... torture," and based on conduct that is "universally condemned and renounced as offending internationally recognized norms of civilized conduct." *Tachiona*, 234 F.Supp.2d at 437; see *id.* at 438 (holding that Zimbabwean ruling party's public dragging of dead victims' bodies before their homes, kin and neighbors, constituted CIDT because it was an affront to their human dignity and caused their families severe emotional distress); see also *In re South African Apartheid Litigation*, 617 F.Supp.2d at 264 (holding that plaintiffs had adequately alleged a CIDT claim under an aiding and abetting theory against automobile companies' security personnel who "provided information about anti-apartheid activists to the South African Security Forces, facilitated arrests, provided information to be used by interrogators, and even participated in interrogations").

As noted, several courts have stated that CIDT is actionable "if the specific conduct alleged by the plaintiffs has been universally condemned as cruel, inhuman, or degrading." *Bowoto*, 557 F.Supp.2d at 1093–94; *Qi*, 349 F.Supp.2d at 1321–22 (stating that where the conduct alleged in is sufficiently egregious, a CIDT claim is actionable). Because multiple elements of plaintiffs' CIDT claim do not involve conduct

that has been universally condemned as cruel, inhuman, or degrading, the court concludes that the specific CIDT claim plaintiffs assert does not exclusively involve matters of universal concern.

### (f) Consistent Pattern of Gross Violations of Human Rights

■ Plaintiffs' final ACTA claim alleges that the repeated human rights abuses in which Rio Tinto engaged violated an international law norm forbidding "infringements of recognized human rights that are not violations when committed singly or sporadically." [66] Specifically, plaintiffs contend that "Rio's consistent abuse of [plaintiffs], both in terms of destruction of the environment, its racial discrimination and its participation in the military efforts to reopen the mine, violate international law." [67]

Like their claim that Rio Tinto caused environmental damage that violated their rights to life and health, plaintiffs' allegation that the company engaged in a "consistent pattern" of human rights violations suffers from a lack of specificity that undermines the notion that there is a universal consensus condemning the conduct. Although neither party argued the question in *Rio Tinto I*, the court recognized as much, observing that "plaintiffs' claim for

gross violations of human rights is not based on any specific provision of international law that is universally recognized." *Rio Tinto I*, 221 F.Supp.2d at 1163 n. 190. Post-*Sosa* jurisprudence, though limited, appears to affirm this conclusion. See, e.g., *Bowoto*, 557 F.Supp.2d at 1096 ("Plaintiffs appear to concede that their claim of consistent patterns of gross violations of human rights cannot survive scrutiny after *Sosa* and instead choose to focus on their independent causes of action . . . Accordingly, the court grants defendants' motion for summary judgment as to plaintiffs' eighth cause of action").

Like plaintiffs' CIDT claim, moreover, their consistent pattern claim rests on a wide range of conduct, some of which may involve matters of "universal concern" and some of which does not. For this reason, and because there is a high probability that different countries will have different definitions of what constitutes a "consistent pattern of gross violations of human rights," the court believes that plaintiffs' seventh and final ACTA claim does not involve matters of "universal concern."

### 3. Balancing Nexus and Matters of "Universal Concern" [68]

■ As alleged in the first amended complaint, plaintiffs' claims for crimes against humanity, war crimes, and racial

---

**66.** First Amended Complaint, ¶ 264 (citing Restatement § 702(g), cmt. m).

**67.** *Id.*, ¶ 265.

**68.** For the most part, Rio Tinto's briefs, exhibits and the declaration of its expert, Duke Law Professor Madeline Morris, argue that a nation's commitment to enforcing international law norms of "universal concern" is not inconsistent with that nation requiring exhaustion of adequate and available local remedies. (See Rio Tinto Opening Brief at 7–14, 18–20; Rio Tinto Reply at 3–6; Expert Declaration of Madeline Morris.) While interesting, Rio Tinto's survey of the role exhaustion plays in enforcing international human rights in international and foreign tri-

bunals is tangential to the threshold inquiry the plurality directed the court to undertake—i.e., balancing the nexus between the United States and plaintiffs' claims against the universality of the claims. For this reason, the court has not directly referenced the information in this order. It observes, however, that the arguments advanced by Rio Tinto are not without controversy, and that, to the extent they imply that exhaustion ought to be required in every ATCA case, they have been expressly rejected by seven members of the *Rio Tinto IV* en banc panel. In his *Rio Tinto IV* dissent, in fact, Judge Reinhardt addressed many of these contentions. He noted that "[t]he scope of the exhaustion rule is less settled . . . in the

discrimination implicate matters of "universal concern." "Individuals have an interest in obtaining a remedy for such injustices and the United States has an interest in punishing the '*hostis humani generis,* an enemy of all mankind.'" *Rio Tinto IV,* 550 F.3d at 845 (Reinhardt, J., dissenting) (quoting *Filartiga,* 630 F.2d at 890). While the nexus between plaintiffs' claims and the United States is weak, the court believes that this consideration is outweighed by the "heinous" nature of the allegations on which the claims are based, and for that reason concludes that it should not, as a prudential matter, impose an exhaustion requirement with respect to the claims.

By contrast, plaintiffs' remaining claims, as pled, implicate norms that are not universal. This fact, coupled with the weakness of the nexus between the claims and the United States, weighs in favor of conducting a traditional two-step exhaustion analysis with respect to these claims. As masters of their complaint, plaintiffs can choose whether to bypass this additional step by amending their complaint to allege only universal claims that do not warrant exhaustion.[69] If plaintiffs wish to proceed with all of the claims alleged in the first amended complaint, however, the court will examine the availability of remedies and the futility of requiring exhaustion as respects plaintiffs' claims for violation of their rights to health, life, and security of the person; cruel, inhuman, and degrading treatment; international environmental violations; and a consistent pattern of gross human rights violations.[70]

realm of international human rights [than in the arena of diplomatic protection, where it developed, since international human rights] ... law recognizes the primacy of the fundamental rights of individuals and the interest of states other than the victims' own in guaranteeing such universal human rights." *Id.* at 843. Given that the ATCA vests jurisdiction in U.S. court only for "heinous offences like genocide, crimes against humanity, and war crimes," and that "[i]ndividuals have an interest in obtaining a remedy for such injustices and the United States has an interest in punishing the '*hostis humani generis,* an enemy of mankind,'" Judge Reinhardt argued that "the individual and institutional interests in an ATS case weigh heavily against requiring exhaustion." *Id.* at 845. Additionally, he noted:

"The exhaustion principle is even less established in the enforcement of international human rights norms in domestic courts against individuals and corporations, than in supranational tribunals against states. Exhaustion under international law governs the *vertical* or *hierarchical* relationship of courts—such as the relationship of international tribunals like the International Court of Justice and the Inter–American Court of Human Rights to domestic courts.... And when a case is brought in such international tribunals, the defendant is often the state.... In adjudicating ATS claims, however, United States courts sit in *horizontal,* not vertical, relationship with courts of other countries that might exercise its jurisdiction over the same questions of international law as against individual defendants. The more appropriate point of comparison is therefore whether courts of other nations have imposed such a requirement before exercising universal jurisdiction. It appears that, for the most part, they have not." *Id.* at 844 (citations omitted).

69. For the most part, the claims as to which the court imposes a prudential exhaustion requirement are those it concluded it lacked subject matter jurisdiction to hear under ACTA in *Rio Tinto I.* The only exception is plaintiffs' sixth claim to the extent it alleges a violation of international law as reflected in UNCLOS. As to that claim, the court held that it gave rise to jurisdiction under the ACTA. Here, the court concludes that the claim does not address matters of sufficiently universal concern to overcome the weak nexus between this country and plaintiffs and their claims such that conducting a traditional exhaustion analysis is warranted.

70. Although not entirely clear, it appears that the panel and en banc decisions in the Ninth Circuit leave intact the court's earlier dismissal of the claims for violation of the rights to life, health and security of the person; cruel,

**1032**

## III. CONCLUSION

For the reasons stated, the court finds it inappropriate to impose a prudential exhaustion requirement with respect to plaintiffs' claims for crimes against humanity, war crimes, and racial discrimination. Should plaintiffs' wish to pursue their ATCA claims for violation of the rights to health, life, and security of the person; cruel, inhuman, and degrading treatment; international environmental violations; and a consistent pattern of gross human rights violations, the court will conduct the traditional two-step exhaustion analysis with respect to those claims before returning the matter to the Ninth Circuit.[71] Plaintiffs are directed to file a status report indicating whether they intend to pursue these claims on or before **Monday, August 31, 2009.** If plaintiffs do elect to pursue these claims, the court will issue a briefing schedule and set a hearing date for the traditional two-step exhaustion analysis.

inhuman and degrading treatment (albeit this dismissal was with leave to amend); environmental harm under the principle of sustainable development; and a consistent pattern of gross human rights violations.

71. At the hearing, plaintiffs expressed a desire to amend their cruel, inhuman, and degrading treatment claim to ensure that the claim is based on underlying norms that have been found to be matters of universal concern in past ATCA litigation. If plaintiffs wish to proceed in this fashion, they are directed to advise the court of this fact in the report that

they are directed to file below. Because the matter is before the court on limited remand from the Ninth Circuit, the court does not believe it is appropriate to permit amendment of the pleadings at this stage. Rather, the court will permit plaintiffs to abandon their cruel, inhuman, and degrading treatment claim as *currently* pled without prejudice to their right to file an amended complaint if and when the matter is returned from the Ninth Circuit. Any new claim would be subject to whatever exhaustion procedure the Ninth Circuit adopts after further consideration of this matter.